NOT DESIGNATED FOR PUBLICATION

No. 117,732

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TIMOTHY SUMPTER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed January 18, 2019.
Affirmed.

*Kelly H. Foos*, *Katie Gates Calderon* and *Ruth Anne French-Hodson*, of Shook, Hardy & Bacon
L.L.P., of Kansas City, Missouri, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and LORI BOLTON FLEMING, District
Judge, assigned.

ATCHESON, J.: In 2012, a Sedgwick County District Court jury convicted Timothy
Sumpter of seven crimes arising from four incidents in which he sexually assaulted
different women. The State charged Sumpter in three cases that were consolidated for
trial. The jury found Sumpter not guilty of one felony, and some of the convictions were
for less serious crimes than the State had charged. After this court affirmed the verdicts
and sentences on direct appeal, Sumpter, with the aid of new lawyers, filed a habeas

1

corpus motion contending he received constitutionally deficient legal representation and asking that the convictions be reversed. See *State v. Sumpter*, No. 108,364, 2013 WL 6164520 (Kan. App. 2013) (unpublished opinion). The district court held a nonevidentiary hearing on the motion with the prosecutor and Sumpter's new lawyers and later issued a detailed written ruling denying Sumpter any relief. Sumpter has appealed that ruling. We find Sumpter has failed to show a constitutional injury depriving him of a fundamentally fair adjudication of the charges against him, meaning he has not persuaded us that absent the errors he alleges there is a reasonable probability the outcome would have been different. We, therefore, affirm the district court.

Given the issues Sumpter has raised, we dispense with an extended opening narrative of the trial evidence and procedural history in favor of focused recitations tied to the particular points. The parties know the record well. The four incidents resulting in charges against Sumpter occurred between September 2010 and April 2011, so the criminal code in effect then applies.[1] We turn to the general legal principles governing habeas corpus motions under K.S.A. 60-1507 and then consider the issues Sumpter has raised.

[1]The Legislature approved a recodification of the Kansas Criminal Code in 2010. The new code didn't go into effect until July 1, 2011.

*Guiding Legal Principles*

To prevail on a 60-1507 motion, a convicted defendant must show both that his or her legal representation fell below the objective standard of reasonable competence guaranteed by the right to counsel in the Sixth Amendment to the United States Constitution and that absent the substandard lawyering there probably would have been a different outcome in the criminal case. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014); see *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468

2

(1985) (adopting and stating *Strickland* test for ineffective assistance). A reasonable probability of a different outcome "undermine[s] confidence" in the result and marks the criminal proceeding as fundamentally unfair. See *Strickland*, 466 U.S. at 694. The movant, then, must prove both constitutionally inadequate representation and sufficient prejudice attributable to that representation to materially question the resulting convictions.

As the United States Supreme Court and the Kansas Supreme Court have stressed, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success notwithstanding demonstrable competence. See *Strickland*, 466 U.S. at 689-90; *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Rarely should a lawyer's representation be considered substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among arguably suitable options. *Strickland*, 466 U.S. at 690-91. Whether a lawyer had made reasoned strategic decisions bears on the competence component of the *Strickland* test.

Regardless of the inadequacy of legal representation, a 60-1507 motion fails if the movant cannot establish substantial prejudice. And the district court properly may deny a motion that falters on the prejudice component of the *Strickland* test without assessing the sufficiency of the representation. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see *Edgar v. State*, 294 Kan. 828, 843-44, 283 P.3d 152 (2012); *Oliver v. State*, No. 106,532, 2013 WL 2395273, at *5 (Kan. App. 2013) (unpublished opinion). In other words, even assuming a criminal defendant's legal representation fell below the Sixth Amendment standard, he or she is not entitled to habeas corpus relief if the result would have been no different with competent counsel.

Sumpter has challenged the constitutional adequacy of both his trial lawyer and the lawyer who handled the direct appeal. The *Strickland* test also guides review of an appellate lawyer's representation of a defendant in a criminal case. See *Miller v. State*, 298 Kan. 921, 929-30, 318 P.3d 155 (2014) (applying *Strickland* test to performance of lawyer handling direct appeal).

A district court has three procedural options in considering a 60-1507 motion. The district court may summarily deny the motion if the claims in the motion and the record in the underlying criminal case conclusively show the movant is entitled to no relief. Or the district court may conduct a preliminary hearing with lawyers for the State and the movant to determine if a full evidentiary hearing is warranted. Finally, the district court may hold a full evidentiary hearing. See *Sola-Morales*, 300 Kan. at 881. Absent an evidentiary hearing, the district court must credit the factual allegations in the 60-1507 motion unless they are categorically rebutted in the record of the criminal case. Where, as here, the district court limits a preliminary hearing to the argument of counsel before denying the motion, we exercise unlimited review of the ruling on appeal. *Grossman v. State*, 300 Kan. 1058, 1061, 337 P.3d 687 (2014); *Sola-Morales*, 300 Kan. at 881. The district court has received no new evidence, and we can review the motion and the underlying record equally well.

With those principles in mind, we take up the points Sumpter has presented on appeal from the district court's denial of his 60-1507 motion.

*Aggravated Kidnapping Conviction*

Sumpter contends the State failed to produce sufficient evidence to support the jury's verdict for the aggravated kidnapping of J.B.—the most serious charge on which he was convicted. Sumpter faults his trial lawyer for misunderstanding the fit between the elements of aggravated kidnapping and the evidence against him and fumbling the issue

4

in the district court. He also faults the lawyer handling the appeal for not raising sufficiency of the evidence at all.

Because the district court did not hold an evidentiary hearing, we have no insight into what strategic decisions those lawyers may have made in assessing potential lines of attack on that charge at the trial level and on the resulting conviction on appeal. As a practical matter, evidence about those professional judgments commonly must be developed in an evidentiary hearing on the 60-1507 motion at which the lawyer produces his or her work file and testifies about why he or she handled the criminal case in a particular manner. See *State v. Hargrove*, 48 Kan. App. 2d 522, 552, 293 P.3d 787 (2013); *Johnson v. State*, No. 109,169, 2014 WL 1362929, at *5 (Kan. App. 2014) (unpublished opinion); *Oliver*, 2013 WL 2395273, at *5.[2]

[2]In criminal cases, defense lawyers typically need not explain why they represented their clients as they did. If a defendant requests a new trial based on the ineffectiveness of his or her trial lawyer or asserts ineffectiveness as a point on direct appeal, the district court may—on its own or at the direction of an appellate court—hold what's called a *Van Cleave* hearing to explore the claim. See *State v. Van Cleave*, 239 Kan. 117, Syl. ¶ 2, 716 P.2d 580 (1986). A *Van Cleave* hearing functionally replicates an evidentiary hearing on a 60-1507 motion, except that it is held as part of the direct criminal case rather than in a collateral proceeding. A district court could rely on the evidentiary record from a *Van Cleave* hearing to summarily deny a 60-1507 motion questioning purported strategic decisions of the trial lawyer. Usually, however, ineffectiveness claims will be deferred to 60-1507 proceedings, since they become moot if a defendant raises some other issue in the direct criminal case requiring a new trial. So the record in most criminal cases lacks evidence about the defense lawyer's reasons for representing the defendant as he or she did. This is such a case.

In rare situations, a reviewing court can say that a lawyer's action or inaction could not have been the product of any reasoned strategic decision because the effect is so patently detrimental to the client. See *Hargrove*, 48 Kan. App. 2d at 551 ("No sound strategy could warrant a defendant assuming a heavier burden of proof than required under the law in establishing a defense . . . . [an] error incontestably devoid of strategic

worth."). Sumpter suggests the record here establishes that sort of error with respect to his conviction for aggravated kidnapping.

But the quality of the lawyers' representation becomes irrelevant if Sumpter cannot also show prejudice. If the trial evidence legally supports the jury's verdict and, thus, the conviction, his argument founders on that part of the *Strickland* test. We engage that analysis and conclude the State presented sufficient evidence to prove the aggravated kidnapping charge. To assess sufficiency we review the evidence in a light most favorable to the State as the prevailing party and ask whether reasonable jurors could return a guilty verdict based on that evidence. *State v. Butler*, 307 Kan. 831, 844-45, 416 P.3d 116 (2018); *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014). Sumpter does not contend his trial lawyer should have presented more or different evidence on the charge.

In January 2011, Sumpter accosted J.B., a young woman, about 1 a.m. as she walked to her car in a parking lot in Old Town, an entertainment district in downtown Wichita. When they got to J.B.'s car, he forced his way in, grabbed J.B., and attempted to sexually assault her. Sumpter had his knee across J.B.'s throat as he tried to touch her vagina. She briefly lost consciousness. When she regained her senses, Sumpter was masturbating. He forced J.B. to touch his penis. During the attack, Sumpter took J.B.'s car keys from her as she attempted to fight him off and threw them out the window.

Part way through the attack, J.B. was able to force Sumpter out of the car and to lock the doors. Sumpter then retrieved the keys and displayed the keys in an effort to get J.B. to open the door. She did. Sumpter forced his way back in and resumed his assault. Another car fortuitously pulled up. Sumpter got out of J.B.'s car. He spoke briefly to the driver of the other car. J.B. drove away; she immediately contacted the police. Police investigators later identified and interviewed the driver of the other car. The driver described Sumpter jumping out of the car with his belt unbuckled as J.B. shouted, "He

6

tried to rape me." As J.B. drove off, Sumpter told the man, "She's lying . . . . That's my girl."

J.B. acknowledged she had been drinking that night. There were minor variations in the accounts of the incident she gave police investigators, testified to at a preliminary hearing, and then described for the jurors during the trial.

The State charged Sumpter with aggravated kidnapping, attempted rape, and aggravated sexual battery. The jury convicted him of all three crimes.

For the aggravated kidnapping charge, the State had to prove Sumpter "confin[ed]" J.B. by force "to facilitate" his intent to rape her and she suffered bodily harm as a result. See K.S.A. 21-3420; K.S.A. 21-3421. Under the former code, the relevant elements of kidnapping were: The "taking or confining of a person . . . by force . . . with the intent to hold such person . . . to facilitate flight or the commission of any crime." K.S.A. 21-3420. The infliction of "bodily harm" on the victim elevated the crime to aggravated kidnapping. K.S.A. 21-3421. For purposes of the 60-1507 motion, Sumpter doesn't dispute the evidence of the attempted rape or that J.B. was injured. He focuses on the element of confinement.

In *State v. Buggs*, 219 Kan. 203, 215, 547 P.2d 720 (1976), the Kansas Supreme Court held that kidnapping requires movement or confinement of the victim that is more than "slight and 'merely incidental' to the commission of an underlying . . . crime." The movement or confinement constituting facilitation required for kidnapping entails some greater intrusion upon the victim's freedom than does the underlying crime and has some discernible independence from the conduct necessary to carry out that crime. 219 Kan. at 216. The court identified several criteria differentiating movement or confinement sufficient to support a kidnapping conviction from that legally considered no more than an intrinsic part of another crime. The movement or confinement:

7

"(a) Must not be slight, inconsequential and merely incidental to the other crime;

"(b) Must not be of the kind inherent in the nature of the other crime; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

The court characterized the considerations as illustrative rather than exhaustive and pointed out they "may be subject to some qualification when actual cases arise." 219 Kan. at 216. Kansas courts continue to use the *Buggs* standards to assess evidence in kidnapping and aggravated kidnapping cases bearing on the element of movement or confinement. See *State v. Curreri*, 42 Kan. App. 2d 460, 462-65, 213 P.3d 1084 (2009); *State v. Brown*, No. 115,613, 2017 WL 5015486, at *2-5 (Kan. App. 2017) (unpublished opinion); *State v. Harris*, No. 113,879, 2017 WL 1035343, at *8-9 (Kan. App. 2017) (unpublished opinion); PIK Crim. 4th 54.210, Comment. The *Buggs* court offered three paired hypothetical examples—two involving robberies and one involving rape—to illustrate what would and would not support a kidnapping charge. They described movement of the victims or movement coupled with confinement and aren't especially apt here.

The principle recognized in *Buggs* theoretically avoids kidnapping convictions for limited movement or confinement of a victim integral to the commission of another crime. It may be thought of as a particularized application of the rule prohibiting multiplicitous convictions for conduct amounting to a single crime. See *State v. Weber*, 297 Kan. 805, 808, 304 P.3d 1262 (2013) (convictions multiplicitous when State prosecutes single crime as two or more offenses exposing defendant to pyramiding punishments for one wrong); *State v. McKessor*, 246 Kan. 1, 10-11, 785 P.2d 1332 (1990) (recognizing *Buggs* standards directed at multiplicity problem). The *Buggs* court

effectively laid out a totality-of-the-circumstances standard that, unlike a bright-line rule, creates a fuzzy border where close cases turn on seemingly minor differences. It also diminishes any given case as precedent for a somewhat similar, though not entirely analogous, set of circumstances.

Here, Sumpter confined J.B. in the midst of the criminal episode when she forced him out of her car and he retrieved her keys that he had earlier thrown out the window. At that point, J.B. was unable to leave. If she tried to get out of the car, Sumpter could easily seize her. And she couldn't drive the car away, thereby escaping, without the keys. Sumpter had, thus, effectively trapped J.B. in the enclosed space of the vehicle—a circumstance he highlighted by displaying the keys to her. Sumpter then used the keys as part of a ploy to get J.B. to unlock the car to get them back. When she did, he forced his way in and resumed his assault of her. The confinement was clear, deliberate, and more than instantaneous. To support a kidnapping or aggravated kidnapping conviction, the confinement need not be extended. No particular amount of time is required; the fact of confinement is sufficient. *Buggs*, 219 Kan. at 214; *State v. Ellie*, No. 110,454, 2015 WL 2342137, at *6 (Kan. App. 2015) (unpublished opinion).

The standoff between Sumpter and J.B. and, thus, the confinement cannot be characterized as simply incidental to or inherent in the sexual assault. Sumpter held J.B. hostage in a specific place and sought to gain access to that place to commit a crime against her. But that situation could have been the prelude to all sorts of crimes and was not unique to rape or even sex offenses. Having gotten into the car, Sumpter could have robbed or severely beaten J.B. The point is Sumpter trapped J.B. in a small, closed place of limited safety and induced J.B. to compromise that safety in an effort to escape. Her effort permitted Sumpter entry to the car making the commission of the crime that followed "substantially easier" than if he had to physically break in to the car. The circumstances fit within the *Buggs* test for a confinement sufficiently distinct from the

underlying crime to be successfully prosecuted as an aggravated kidnapping given J.B.'s undisputed injuries.

The specific facts here tend to set this conviction apart from more common confinement scenarios found to be kidnapping. See, e.g., *State v. Weigel*, 228 Kan. 194, Syl. ¶ 4, 612 P.2d 636 (1980) (robber herds bank employees into vault and attempts to lock it); *State v. Dunn*, 223 Kan. 545, 547, 575 P.2d 530 (1978) (three inmates at state prison hold two employees hostage in office for five hours while demanding "a car and free passage" from facility in exchange for their release). But it is no less a kidnapping because it is unusual. By the same token, however, these circumstances do not lend themselves to any sweeping conclusion or rule about confinement as an element of kidnapping. Because the trial evidence was sufficient for the jury's verdict, Sumpter could have suffered no prejudice from his lawyers' handling of the charge and conviction either in the district court leading up to and during the trial or on direct appeal in this court. He has failed to show a basis for relief under K.S.A. 60-1507.

*Consolidation of Cases for Trial*

Sumpter contends the lawyers representing him in the district court and on appeal failed to properly contest the consolidation of three cases comprising four separate incidents for a single trial. He says the unfair prejudice to him of having the jurors hear about the four sexually based assaults substantially outweighed any judicial efficiency in trying the cases together. And, he says, his lawyers provided constitutionally substandard representation in fumbling the issue.

Given the exceedingly broad rules governing the admissibility of sexual misconduct as other crimes evidence, Sumpter cannot demonstrate undue prejudice in his consolidated trial. As we explain, had he been tried separately in each case or for each incident, the other incidents would have been admissible under K.S.A. 2011 Supp. 60-

455(c) to show his propensity or proclivity to engage in sexually aggressive and unlawful conduct. In the consolidated case, however, the jurors were instructed they could consider only the evidence admitted as to a particular charge in determining Sumpter's guilt or innocence of that charge—theoretically preventing them from relying on the multitude of incidents to bolster the State's evidence of each incident. See PIK Crim. 4th 68.060. Ultimately, Sumpter was better off in a consolidated trial than in sequential trials of each case in which the other incidents would have been admitted as propensity evidence. Neither outcome, however, could be described as advantageous to Sumpter.

We outline briefly the three separate cases the State filed against Sumpter. The State charged the attack on J.B. in one case. We have already laid out those charges and a summary of the attack. When the police questioned Sumpter months later, he initially said he didn't know J.B. but admitted to being in Old Town at the same time when a woman attacked him and he defended himself. Sumpter agreed with the detectives that he might be the person shown in an indistinct surveillance video of J.B.'s car and what happened there.

At trial, Sumpter offered a confusing story about J.B. spitting on him and then pulling him into the car and coming on to him sexually. He admitted touching J.B.'s buttocks and masturbating but denied trying to touch her pubic area.

In a second case, the State charged Sumpter based on two distinct incidents:

• In September 2010, Sumpter met A.C., a 23-year-old woman, at a party, and they arranged to get together sometime later at a fast food restaurant. From the restaurant, Sumpter drove them to a nature trail where they walked and talked for a while. Sumpter then pulled A.C. to the ground, grabbed her buttocks, and masturbated. A.C. convinced him to stop and left the area. Shortly afterward, Sumpter texted A.C. to explain that a

11

nurse told him he had a bad reaction to a prescription medication. A.C. reported the assault to the police the next day.

When detectives questioned him months later, Sumpter denied knowing A.C. or having any contact with her. Investigators obtained copies of the text messages between Sumpter and A.C., and those communications were admitted as evidence in the trial. During his testimony, Sumpter told the jurors he had gone to the nature trail with A.C. and had touched her in a sexual manner. He suggested the encounter had been consensual. The jury found Sumpter not guilty of attempted rape and found him guilty of misdemeanor sexual battery as a lesser included offense of aggravated sexual battery, a felony.

• In February 2011, Sumpter called A.P., a 24-year-old woman, who he knew from her employment at a supermarket where Sumpter regularly shopped. As a store employee, A.P. occasionally cashed checks for Sumpter. According to A.P., Sumpter telephoned her in the middle of the night and asked to meet her ostensibly because he was distraught over the death of a close friend. She declined, saying she had to be at work early in the morning. When A.P. arrived at the supermarket, Sumpter was already there. He tried and failed to coax her into leaving with him so they could talk about his friend; he then followed her into the store. In one of the aisles, Sumpter hugged A.P. and fondled her buttocks. She protested, and he left. A.P. reported the incident to the police that day.

Sumpter later told detectives he knew A.P. because she cashed checks for him at the store. He denied grabbing or hugging A.P. At trial, Sumpter admitted he hugged A.P. and touched her buttocks. The jury convicted Sumpter of misdemeanor sexual battery as a lesser included offense of a charge of aggravated sexual battery.

In the third case, the State charged Sumpter with the April 2011 kidnapping and sexual assault of A.E., a 19-year-old woman. A.E. said she and Sumpter separately turned

12

up at a loosely organized gathering at a friend of a friend's house. They became separated from the other partygoers, and Sumpter exposed himself and began to masturbate. A.E. said when she got angry and tried to leave, Sumpter began crying about his dead father—the trial evidence showed Sumpter's father had died years earlier. A.E. testified that she felt sorry for Sumpter. They left the house and drove around in Sumpter's SUV. Sumpter began talking about killing himself, so A.E. tried to get away. Sumpter grabbed her and they physically fought.

As a private security guard pulled up to the SUV, Sumpter told A.E. he would take her back to the party. But after the security guard left, Sumpter drove down a dirt road, stopped the vehicle, and attacked her. A.E. said Sumpter put his hands down her pants and grabbed her buttocks as she fought back. A Sedgwick County sheriff's deputy drove up to the SUV and got out to investigate what was going on. By then, it was about 2:30 a.m. A.E. described what had happened. Sumpter offered that he and A.E. actually had been in a relationship for over a year. The deputy arrested Sumpter.

At trial, Sumpter admitted trying to have sex with A.E. while they were in the SUV. He denied masturbating in front of her at the party and trying to grab her buttocks. The State had charged Sumpter with aggravated sexual battery and kidnapping. The jury convicted him of aggravated sexual battery and of criminal restraint, a misdemeanor, as a lesser offense of kidnapping.

The State filed a motion to consolidate the three cases (and, thus, the four incidents) for trial to a single jury. Sumpter opposed the motion and requested the incidents involving A.C. and A.P. be severed for separate trials. The district court ordered consolidation. In his direct appeal, Sumpter challenged the order, arguing the incidents were not sufficiently similar to be joined for trial under K.S.A. 22-3203. He did not argue that consolidation was unduly prejudicial. On direct appeal, this court found

13

consolidation satisfied the statutory requirements and affirmed the district court's ruling on that basis. *Sumpter*, 2013 WL 6164520, at *3-6.[3]

[3]As a member of the panel deciding the direct appeal, I wrote a short concurrence that deliberately bordered on the delphic but hinted at reservations about consolidation. *Sumpter*, 2013 WL 6164520, at *12. I was troubled by the possibility of undue prejudice to Sumpter in a single trial of all four incidents. But the appellate lawyer did not brief that issue and at oral argument indicated she hadn't really considered it. So I confined my review to what the parties presented. See *State v. Bell*, 258 Kan. 123, 126-27, 899 P.2d 1000 (1995) (as general rule, court should not consider issue parties have neither raised nor briefed). The issue has been fully briefed in this proceeding. Based on that argument and the broad legislative mandate in K.S.A. 2011 Supp. 60-455(d), I am persuaded Sumpter did not face legally impermissible prejudice in the consolidated trial.

In his 60-1507 motion, Sumpter constitutionalizes the consolidation issue by arguing that his lawyers in the criminal case failed to competently present undue prejudice as a compelling ground against a single trial. Without an evidentiary hearing, we pass on reviewing what strategic considerations, if any, shaped the lawyers' approaches to consolidation and turn to the second aspect of the *Strickland* test to explore whether the outcome might have been different if Sumpter had received a separate trial on each incident. We, therefore, have to unspool what likely would have happened if Sumpter had successfully opposed the State's motion to consolidate and compare that with how the actual trial played out.

As we have explained, in the trial, the district court instructed the jurors that they should separately consider the evidence on each count or charge and that they should be "uninfluenced" in deciding Sumpter's guilt on that count or charge by the evidence bearing on the other charged crimes. See PIK Crim. 4th 68.060. Based on the instruction, the jurors should have considered each incident separate from the other three. Appellate courts presume that jurors follow the instructions they are given. *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017). In a backward looking evaluation, a criminal defendant must point to something in the record suggesting otherwise to make any legal headway. See *State v. Kleypas*, 305 Kan. 224, 279, 382 P.3d 373 (2016). Nothing

14

indicates the jurors deviated from that directive in their deliberations. The Kansas Supreme Court has endorsed an instruction like PIK Crim. 4th 68.080 as an effective tool for directing jurors on how to consider evidence during their deliberations in cases involving distinct criminal episodes. See *State v. Cruz*, 297 Kan. 1048, 1057-58, 307 P.3d 199 (2013).

During the pretrial proceedings on consolidation, Sumpter's lawyer argued that jurors would be hard pressed to compartmentalize the evidence on each of the four incidents and to disregard the fairly intuitive implication that the sheer number of separate allegations tended to reinforce the validity of each one. The recognized dangers in admitting other crimes evidence include portraying the defendant as a chronic lawbreaker deserving of punishment for that reason alone or supporting the defendant's guilt through a pattern of alleged wrongdoing even though the evidence of any one instance may be weak. See *State v. Gunby*, 282 Kan. 39, 48-49, 144 P.3d 647 (2006). The same danger lurks in a single trial of consolidated criminal episodes, notwithstanding a contrary jury instruction. Despite those genuine concerns, Sumpter has failed to show that any of those dangers were realized in his trial.

The jurors returned a decidedly mixed set of verdicts. They found Sumpter not guilty of one especially serious felony, convicted him of lesser offenses on three charges, and convicted him as charged of four crimes. We hesitate to read too much into those decisions. They do not, however, indicate a jury in the throes of an irrational passion or prejudice to convict regardless of the evidence. And the Kansas Supreme Court has recognized split verdicts may be viewed as consistent with a jury following the admonition of an instruction based on PIK Crim. 4th 68.060. See *Cruz*, 297 Kan. at 1058. In short, the outcome in Sumpter's trial was not obviously infected with unfair prejudice because the jury considered all four incidents. This court so noted in considering Sumpter's direct appeal. *Sumpter*, 2013 WL 6164520, at *6.

15

The question posed here, however, is whether Sumpter reasonably could have expected a different outcome had the district court denied the State's request to consolidate and ordered a separate trial for each incident. If so, then, Sumpter has demonstrated the sort of prejudice required under *Strickland*.

Absent consolidation, the State presumably would have sought to introduce at one trial the circumstances of the other three episodes as relevant evidence of other crimes or wrongs under K.S.A. 2011 Supp. 60-455(d), to prove Sumpter's propensity to engage in sexual misconduct and that he acted on that propensity. See *State v. Smith*, 299 Kan. 962, 970, 327 P.3d 441 (2014). In pertinent part, K.S.A. 2017 Supp. 60-455(d) states:

> "(d) Except as provided in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense . . . evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative."

Propensity entails a disposition or proclivity to engage in the defined activity. Accordingly, to be admitted as propensity evidence under K.S.A. 2017 Supp. 60-455(d), an instance of conduct need only be sufficiently similar to the charged crime to display a common sexually based disposition or proclivity. Without belaboring the factual circumstances, each incident shows a proclivity on Sumpter's part consistent with the other incidents. So the evidence would fall within the broad rule of admissibility in K.S.A. 2017 Supp. 60-455(d). For purposes of our analysis, we assume the evidence would not be admissible under the more restrictive requirements of K.S.A. 2017 Supp. 60-455(b).

Even when a district court finds evidence satisfies the general test for admissibility in K.S.A. 2017 Supp. 60-455(d), it must then determine that the probative value outweighs any undue prejudice to the defendant before allowing the jury to hear the evidence. *State v. Bowen*, 299 Kan. 339, Syl. ¶ 7, 323 P.3d 853 (2014) (recognizing 60-

16

455[d] requires balancing of probativeness and undue prejudice); *State v. Huddleston*, 298 Kan. 941, 961-62, 318 P.3d 140 (2014) (noting K.S.A. 60-445, cited in 60-455[d], permits balancing probativeness against undue prejudice to exclude unfairly prejudicial evidence). The Kansas Supreme Court has recognized an array of factors that should be assessed in making the determination as to sexually based propensity evidence:

> "'1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence. When analyzing the probative dangers, a court considers: 1) how likely it is such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct. [Citations omitted].' *United States v. Benally,* 500 F.3d 1085, 1090-91 (10th Cir. 2007)." *Bowen*, 299 Kan. at 350.

In each of Sumpter's hypothetical separate trials, the key consideration in admitting the other incidents would be the proof of their factual circumstances and whether the jurors would be required to spend inordinate time and effort in evaluating disputed evidence about them, effectively creating mini-trials.

We believe a district court likely would have admitted the incidents and that decision would have fallen within its wide judicial discretion. *State v. Wilson*, 295 Kan. 605, Syl. ¶ 1, 289 P.3d 1082 (2012) (district court's weighing of probative value against undue prejudice reviewed for abuse of judicial discretion). By evaluating the accounts of each of the incidents and Sumpter's out-of-court statements about them, we can reach reliable conclusions about their admissibility under 60-455(d). Sumpter's trial testimony doesn't really factor into that assessment, since admissibility typically would be based on the State's pretrial request. See K.S.A. 2017 Supp. 60-455(e) (State must disclose evidence at least 10 days before trial). Identity is not a compelling issue in any of the incidents. A.C. and J.B. each spent considerable time with her attacker. A.C. produced

17

inculpatory text messages from Sumpter consistent with her account. Sumpter admitted to police that he was in Old Town when J.B. was assaulted and conceded he might be depicted in the surveillance video. And Sumpter was arrested with A.E. in his SUV. Identity isn't an issue with A.P., either. If the incident happened, A.P. wouldn't have been mistaken about who assaulted her. It happened in the aisle of the supermarket where she worked. By his own admission, Sumpter knew A.P. casually because he had interacted with her as a regular customer at the store.

Likewise, Sumpter's out-of-court statements bolster the argument for admissibility. As we mentioned, Sumpter's denial that he even knew A.C. was undercut by his contemporaneous text messages with her. Those messages not only confirmed they knew each other but that Sumpter had done something untoward for which he was apologizing. The contradiction creates strong circumstantial evidence of a guilty mind and, thus, culpability of conduct roughly consistent with A.C.'s account. See *United States v. Holbert*, 578 F.2d 128, 129 (5th Cir. 1978) ("long line of authority . . . recognizes that false exculpatory statements may be used not only to impeach, but also as substantive evidence tending to prove guilt"); *United States v. Lepore*, No. 1:15-cr-00367-WSD, 2016 WL 4975237, at *2 (N.D. Ga. 2016) (unpublished opinion) ("False exculpatory statements may be used as evidence of consciousness of guilt."). There was similar, if less compelling, evidence as to J.B. Sumpter told the driver who pulled up near J.B.'s car that J.B. was his girlfriend—a patent falsehood. Months later, Sumpter gave an evolving version of his conduct that began with an admission he was in Old Town about the time J.B. was attacked but didn't know her. He then offered a claim that some woman assaulted him for no apparent reason, and finally he allowed that he might be the man in the surveillance video. That sort of shifting narrative, especially coupled with the driver's account of Sumpter's explanation during the incident, also points to a guilty mind. The episode incident involving A.E., where a sheriff's deputy caught Sumpter with her in his SUV on a secluded road in the middle of the night, prompted a similarly disputed

representation—that he and A.E. were in a long-standing relationship. That didn't square with what the deputy observed or A.E. said.

So the implausibility and inconsistency of Sumpter's statements and explanations of each of those incidents would support a conclusion favoring the victim's overall account portraying a sexually motivated assault. The evidence was considerably stronger than an uncorroborated accusation and a corresponding unimpeached denial. In turn, a district court could find those incidents admissible as 60-455(d) evidence of propensity. To be sure, each trial would have been longer because of the propensity evidence. But that would not be a compelling reason to exclude the evidence, especially since the additional time likely would have been a couple of days. In the actual trial, the jurors heard about four days of testimony.

The possible exception to admissibility under 60-455(d) is the incident with A.P. Basically, A.P. said Sumpter hugged and groped her without consent, and he denied doing anything of the kind to her. No circumstantial evidence associated with their interaction lent any particular credibility to either version. So the admissibility of the episode with A.P. as other crimes evidence in a trial of any of the other incidents might be questionable. But the other three incidents would have been admissible in a trial of the episode in which A.P. was the victim. And the incident with A.P. reflects the least persuasive propensity evidence, since it entailed a brief, though wholly unwelcome and disquieting, sexual touching in a public place and lacked the violent physical aggression of the other incidents.

In short, Sumpter would have had to confront largely the same evidence, except perhaps for the incident involving A.P., in separate trials of the charges arising from the attacks involving A.C., J.B., and A.E. Given the sweeping rule of admissibility in K.S.A. 2017 Supp. 60-455(d), a district court need not give the jurors a limiting instruction confining their consideration of the propensity evidence to a narrow purpose or point.

19

*State v. Prine*, 297 Kan. 460, Syl. ¶ 4, 303 P.3d 662 (2013). The jurors in those hypothetical separate trials would have been free to consider the other crimes evidence for virtually any ground bearing on Sumpter's guilt of the charged crimes against the particular victim. The district court would not have given an instruction comparable to PIK Crim. 4th 68.060 confining the jurors' consideration of the evidence on a particular charge to the facts pertaining directly to that charge. As a result, Sumpter would have been materially disadvantaged in separate trials compared to the consolidated trial he received.

Sumpter, of course, says the reverse is true and submits he might well have chosen not to testify in at least some of the separate trials but effectively had to testify in the consolidated trial and, thus, to speak to all of the allegations against him in front of the jurors. Sumpter's argument, however, rests on the premise that in each separate trial none of the other incidents would have been admitted as evidence. But, as we have explained, the premise is faulty. Sumpter cannot point to actual legal prejudice consistent with the *Strickland* test flowing from the consolidated trial as compared to separate trials.

*Overlooked Instances of Prosecutorial Error*

In his 60-1507 motion, Sumpter contends the lawyer handling the direct appeal failed to brief instances of prosecutorial error during the trial and the failure amounted to constitutionally deficient representation. The lawyer did argue on appeal that the prosecutor made several improper remarks in closing argument impermissibly painting Sumpter as a liar and, thus, engaged in misconduct warranting a new trial. On direct appeal, this court found those portions of the closing argument to be fair comment based on the evidence and free of any error. *Sumpter*, 2013 WL 6164520, at *11.

We mention that the Supreme Court revamped the standards for assessing claims of prosecutorial error after Sumpter's trial and direct appeal. See *State v. Sherman*, 305

20

Kan. 88, 108-09, 378 P.3d 1060 (2016). We suppose, however, that the standards in effect at the time of Sumpter's trial and appeal should govern our review of this collateral challenge to his convictions. The Kansas Supreme Court declined to apply *Sherman* in cases that were fully briefed on direct appeal when it was decided. See *State v. Netherland*, 305 Kan. 167, 180-81, 379 P.3d 1117 (2016). And the issue here is the constitutional adequacy of Sumpter's legal representation when the earlier standards for prosecutorial error governed; so it follows the quality of the representation should be measured against the law as it was then. See *Baker v. State*, 20 Kan. App. 2d 807, Syl. ¶ 3, 894 P.2d 221 (1995) (criminal defense lawyer typically not considered constitutionally ineffective for failing to foresee distant or unusual change in law); *Mayo v. Henderson*, 13 F.3d 528, 533-34 (2d Cir. 1994) (under *Strickland* test, "[c]ounsel is not required to forecast changes in the governing law"). The choice, however, is not especially significant. Under either the pre-*Sherman* standards or *Sherman* itself, the focus for our purposes rests on sufficiently substantial prejudice to Sumpter to compromise his right to a fair trial.

Before *Sherman*, the Kansas courts use a well-recognized, two-step test for measuring the impropriety of closing arguments in criminal cases:

> "'First, the appellate court must decide whether the comments fall outside the wide latitude afforded a prosecutor in discussing the evidence and the law. Second, if the prosecutor has exceeded those bounds, the appellate court must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury to the extent the defendant was denied a fair trial. *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009) (outlining mode of analysis); see *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009) (noting considerable range permitted advocates, including prosecutor, in arguing their causes in jury summations).'" *State v. Franco*, 49 Kan. App. 2d 924, 938, 319 P.3d 551 (2014) (quoting *State v. Schreiner*, 46 Kan. App. 2d 778, 793-94, 264 P.3d 1033 [2011], *rev. denied* 296 Kan. 1135 [2013]).

21

If the argument falls outside what is proper, the courts then look at three factors to assess the degree of prejudice:

> "'(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, [22-24,] 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond a reasonable doubt that the error . . . changed the result of the trial], have been met.' [Citations omitted.]" *State v. McReynolds,* 288 Kan. 318, 323, 202 P.3d 658 (2009).

We apply that test here with the observation that the first part used to assess error in a closing argument was carried over in *Sherman*, while the second part for assessing prejudice now looks exclusively at the impact of any erroneous argument on the fairness of the trial without considering prosecutorial ill-will or the flagrancy of the impropriety— misconduct that may be more directly and effectively remedied in other ways.

Sumpter contends that in closing argument to the jurors, the prosecutor mischaracterized the content of the security video depicting part of the episode with J.B. The contention is unavailing. First, although the security video was played for the jurors during the trial and admitted as an exhibit, it is not part of the record on appeal. We cannot compare the video to the prosecutor's description and cannot really assess any purported error. See *State v. Kidd*, 293 Kan. 591, 601, 265 P.3d 1165 (2011) (party claiming error has obligation to provide sufficient record for appellate review); *Harman v. State*, No. 108,478, 2013 WL 3792407, at *1 (Kan. App.) (unpublished opinion) ("When there are blanks in that record, appellate courts do not fill them in by making assumptions favoring the party claiming error in the district court."). On its face, the prosecutor's comment about the video was proper. The prosecutor invited the jurors to

review the video during their deliberations. He described part of what was shown (and what the jurors had already seen during the trial) and explained how it conflicted with Sumpter's testimony. But he expressed no personal opinion about the veracity of the video or Sumpter's account. Given what's in front of us, we find no prosecutorial error.

Sumpter next contends the prosecutor inaccurately described a pro se pretrial motion he filed for a bond reduction. By way of background, the prosecutor used the motion as a statement against interest to cross-examine Sumpter during the trial. In closing argument, the prosecutor said the motion was consistent with Sumpter's testimony that included admissions to facts supporting lesser included offenses while denying facts that would support the more serious charges. A pro se pleading or statements a criminal defendant personally makes in court in the course of self-representation typically are treated as admissions. See *State v. Burks*, 134 Kan. 607, 608-09, 7 P.2d 36 (1932); *United States v. Thetford*, 806 F.3d 442, 447 (8th Cir. 2015).

The prosecutor did appear to misrepresent the motion. In the motion, Sumpter seems to argue that he and his lawyer concluded he could be found guilty only of misdemeanors based on the testimony presented at the preliminary hearing and, therefore, should receive a bond reduction. In the motion, Sumpter neither admitted to committing misdemeanors nor conceded the accuracy of the preliminary hearing evidence. He simply argued the State's strongest evidence would prove only misdemeanors. So to the extent the prosecutor's closing argument to the jury characterized the pretrial motion as some admission of guilt, it amounted to error. But nothing suggested the prosecutor acted out of ill-will, and the error wasn't flagrant in the sense the prosecutor built a theme of the closing argument around the motion. See *State v. Judd*, No. 112,606, 2016 WL 2942294, at *8-9 (Kan. App. 2016) (unpublished opinion) (under pre-*Sherman* standard, prosecutor committed reversible error in closing argument by repeatedly misstating basic point of law as singular theme in arguing to jury for conviction on thin circumstantial evidence). Moreover, the error didn't somehow shift the tide of the case, especially in light of

Sumpter's trial testimony. On the witness stand, Sumpter did admit to conduct likely amounting to comparatively minor crimes against A.C., J.B., and possibly A.E.

The failure of Sumpter's trial and appellate lawyers to raise this point in the direct criminal case could not have resulted in material prejudice under the *Strickland* test. The prosecutor's misstatement about the pretrial motion was not of the magnitude to call into question the jury's verdicts. So the error cannot warrant relief in a collateral challenge to those verdicts under K.S.A. 60-1507.

For his final challenge to the prosecutor's closing argument, Sumpter says the prosecutor misled the jurors about what the State had to prove to convict him of the attempted rape of J.B. In describing the elements of the attempted crime, the prosecutor told the jurors Sumpter had to intend to commit rape when he confined J.B. So, the prosecutor explained, the State did not have to show that Sumpter actually had sex with J.B.—only that he intended to. That's a misstatement of law, since an intent to have consensual sex would not be rape. Without an objection, the prosecutor seemed to realize the problem, corrected himself, and told the jurors the crime required an intent to commit rape. Arguably, though, the correction wasn't a model of clarity.[4]

[4]This is what the prosecutor said:

"And he [Sumpter] told you what his intent was with [J.B.] He minimizes it and says well, I didn't go into that car with the intent to have sex with her. But clearly he told you on the stand, I was going to have sex with her, I thought, I thought she wanted it. Clearly he intended to have sex. I don't have to prove rape occurred, I don't have to prove sex occurred, I have to prove he took her—or I'm sorry, he confined her with the intent to commit sex, commit rape against her. Clearly that was his intent, he told you even yesterday that's what he intended to do."

We see no prosecutorial error. The prosecutor misspoke, realized as much, and immediately offered a revised statement of the law to the jurors. Those kinds of slips are an unavoidable part of the unscripted presentation that is trial practice. The record shows nothing more. See *State v. Jones*, 47 Kan. App. 2d 512, 535, 276 P.3d 804 (2012)

(Atcheson, J., concurring) (deliberate line of questions lacking factual basis "was not a slip of the tongue or a single, poorly phrased question that could be excused as the occasional byproduct of the unscripted give-and-take of trial practice"); *State v. Alexander*, No. 114,729, 2016 WL 5344569, at *5-6 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1320 (2017). Sumpter cannot lay a foundation for relief here. Even if the prosecutor's comment were ambiguous or erroneous, the relevant jury instruction accurately set forth the elements, including the intent to commit rape, and tracked with what appeared to be the prosecutor's revision. Given the brevity of the prosecutor's comment and the clarity of the jury instruction, Sumpter could not have been materially prejudiced.

*Other Challenges Raised in Sumpter's 60-1507 Motion*

Sumpter has raised several additional issues in his 60-1507 motion that fail to warrant relief or further consideration in an evidentiary hearing. Either the record establishes no factual basis to find for Sumpter or settled law forecloses his claims.

• Sumpter contends his statutory right to a speedy trial was violated because he was not present to object to continuances his lawyer requested and received from the district court. At the time, the State had to bring a defendant in custody to trial within 90 days, as provided in K.S.A. 22-3402. Delays attributable to a defendant, such as continuances to prepare for trial, did not count against the 90-day period. But district courts could not grant continuances to defense lawyers if their clients objected. *State v. Hines*, 269 Kan. 698, 703-04, 7 P.3d 1237 (2000). The Kansas Supreme Court has recognized that if a defendant is not present when his or her lawyer requests a continuance (and, thus, cannot object), any resulting delay should be counted in the statutory speedy trial period. *State v. Brownlee*, 302 Kan. 491, 507-08, 354 P.3d 525 (2015).

25

Premised on that rule, Sumpter says because he wasn't present when his lawyer requested and received the continuances, his trial was delayed more than 90 days in violation of K.S.A. 22-3402. We assume the calculation to be accurate for purposes of resolving the issue. Neither Sumpter's trial lawyer nor his appellate lawyer asserted a statutory speedy trial violation. Sumpter contends the omission compromised his Sixth Amendment right to adequate legal representation. The remedy for a statutory speedy trial violation requires any conviction be set aside and the underlying charges be dismissed with prejudice. K.S.A. 22-3402(1). The failure to assert a valid violation would fall below the standard of care and could not be justified as a strategic culling of potential issues. Prejudice to the defendant in overlooking or discarding a speedy trial violation would be manifest.

But Sumpter's claim fails because the Legislature amended K.S.A. 22-3402 while his case was on direct appeal to eliminate a speedy trial violation based on the circumstances he now argues. As amended, K.S.A. 2017 Supp. 22-3402 states in relevant part:

> "If a delay is initially attributed to the defendant, but is subsequently charged to the state for any reason, such delay shall not be considered against the state . . . and shall not be used as a ground for dismissing a case or for reversing a conviction unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay." K.S.A. 2017 Supp. 22-3402(g).

That section of the statute precludes counting a continuance originally assessed to a criminal defendant against the State (and, thus, against the speedy trial time) if a court later concludes the time was erroneously charged to the defendant in the first place. The limitation would be applicable here if we assume the continuances should not have been assessed to Sumpter because he had not authorized or otherwise agreed to them. The Kansas Supreme Court has held the amendment of K.S.A. 22-3402 adding subsection (g)

26

to be procedural and, thus, applicable to any case on direct appeal when it became effective. *State v. Dupree*, 304 Kan. 43, Syl. ¶ 5, 371 P.3d 862 (2016). The court denied relief to the defendant in *Dupree* in circumstances legally comparable to those Sumpter now presents. 304 Kan. at 57. Sumpter cannot demonstrate a violation of his speedy trial rights under K.S.A. 22-3402. His lawyers, therefore, could not have inadequately represented him by failing to allege a purported violation.

• Sumpter contends his lawyers in the criminal case inadequately represented him by failing to challenge the panel of potential jurors summoned at the start of the trial because the group included no African-Americans. Sumpter is African-American. A criminal defendant has a Sixth Amendment right to a jury composed of persons both called for jury duty and then selected to serve in a manner free of racial discrimination, thus reflecting a fair cross-section of the community. *Berghuis v. Smith*, 559 U.S. 314, 319, 130 S. Ct. 1382, 176 L. Ed. 2d 249 (2010); *Duren v. Missouri*, 439 U.S. 357, 359, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979) (recognizing right as incorporated through the Due Process Clause of the Fourteenth Amendment and, thus, applicable to state criminal proceedings). Sumpter did not challenge the composition of the panel of potential jurors at trial or on direct appeal. Ordinarily, a defendant cannot litigate points in a 60-1507 motion that could have been raised on direct appeal. To do so, a defendant must show extraordinary circumstances. Those circumstances may include the constitutional inadequacy of his lawyers in the criminal case. As with the other issues, we have no idea why Sumpter's trial and appellate lawyers did not pursue this claim.

To advance an underrepresentation claim, Sumpter must present evidence that African-Americans appear in venires or panels from which juries are selected in numbers disproportionately below their percentage in the community generally and the reason lies in their "systematic exclusion . . . in the jury-selection process." See 439 U.S. at 364. In support of his 60-1507 motion, Sumpter has offered nothing to show that African-Americans are routinely underrepresented in jury pools in Sedgwick County. His claim

27

sinks on that failure. The absence of African-Americans from the particular jury panel called for his case is nothing more than a statistical anomaly so far as the record evidence demonstrates. An aberration in one panel does not and cannot advance an underrepresentation claim that turns on the systemic exclusion of a recognized group, such as African-Americans, from jury service.

• As part of his sentence, Sumpter will be required to register as a sex offender when he gets out of prison and to report as directed under the Kansas Offender Registration Act, K.S.A. 2017 Supp. 22-4901 et seq. He challenges registration as cruel and unusual punishment violating the Eighth Amendment to the United States Constitution. He also submits a jury must make the specific findings requiring registration consistent with constitutional due process protections. As Sumpter concedes, the Kansas Supreme Court has rejected the arguments that KORA entails punishment subject to the Eighth Amendment or violates due process requirements for jury findings. See *State v. Huey*, 306 Kan. 1005, 1009-10, 399 P.3d 211 (2017), *cert. denied* 138 S. Ct. 2673 (2018) (KORA provisions not considered punishment under Eighth Amendment; in turn, no due process requirement jury find facts supporting registration).

• Sumpter similarly contends lifetime postrelease supervision imposed on him as part of his sentence amounts to constitutionally cruel and unusual punishment. Under this condition, Sumpter will have to report to a parole officer after his release from prison and will be subject to restrictions on his travel, searches of his residence, and other limitations on his liberty. Those limitations are different from (and in addition to) the reporting requirements under KORA.

Again, Sumpter acknowledges the Kansas Supreme Court has turned aside constitutional challenges to lifetime postrelease supervision for comparable convicted sex offenders. See *State v. Williams*, 298 Kan. 1075, 1089-90, 319 P.3d 528 (2014) (lifetime postrelease supervision not cruel and unusual punishment); *State v. Mossman*, 294 Kan.

28

901, 921, 930, 281 P.3d 153 (2012). Sumpter also suggests the requirement violates the Equal Protection Clause of the Fourteenth Amendment, but he neither clearly articulates the disadvantaged class to which he purportedly belongs nor explains why such a classification would be constitutionally impermissible. Our court has rejected equal protections attacks on lifetime postrelease supervision. *State v. Dies*, No. 103,817, 2011 WL 3891844, at *4-5 (Kan. App. 2011) (unpublished opinion) (holding that lifetime postrelease supervision for adult sex offenders does not violate equal protection).

• As he did on direct appeal, Sumpter contends the district court improperly considered his criminal history in determining his sentence. He argues that the district court's use of his past convictions in determining an appropriate sentence impairs his constitutional rights because the fact of those convictions was not proved beyond a reasonable doubt to the jury. He relies on the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), to support that proposition. We denied relief on this issue on direct appeal. *Sumpter*, 2013 WL 6164520, at *11. We do so again now.

The Kansas Supreme Court has consistently rejected that argument and has found the State's current sentencing regimen conforms to the Sixth and Fourteenth Amendments with respect to the use of a defendant's past convictions in determining a presumptive statutory punishment. *State v. Fischer*, 288 Kan. 470, Syl. ¶ 4, 203 P.3d 1269 (2009); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). We, therefore, decline Sumpter's invitation to rule otherwise, especially in light of the court's continuing affirmation of *Ivory*. *State v. Pribble*, 304 Kan. 824, 838-39, 375 P.3d 966 (2016); *State v. Hall*, 298 Kan. 978, 991, 319 P.3d 506 (2014).

*Conclusion*

We have endeavored to meticulously review the numerous points Sumpter has raised on appeal from the denial of his motion for relief under K.S.A. 60-1507. In doing so, we have examined the underlying criminal prosecution, including the trial evidence and the briefing in the direct appeal. We find the district court properly denied the motion. Given the issues and the record, the district court did not need to hold an evidentiary hearing.

Affirmed.