NOT DESIGNATED FOR PUBLICATION

No. 125,883

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TIMOTHY JAMES EUGENE KITTLE,
*Appellant*.


MEMORANDUM OPINION

Appeal from McPherson District Court; JOHN B. KLENDA, judge. Submitted without oral argument. Opinion filed October 25, 2024. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.


Before HURST, P.J., GREEN and ATCHESON, JJ.


PER CURIAM: A jury sitting in McPherson County District Court convicted Timothy Kittle of two sex crimes for molesting his young daughter. The trial evidence essentially boiled down to a credibility contest between the child and Kittle with next to nothing to corroborate either her account or his denial. On appeal, Kittle contends the prosecutor and the district court made improper comments in front of the jury during the trial and a detective violated an order in limine in testifying about her interview of the child. To the extent there were errors, they were minor, and they did not undermine Kittle's right to a fair trial. See *State v. Walker*, 308 Kan. 409, 426, 421 P.3d 700 (2018)

1

(criminal defendant "not entitled to a perfect trial" but must "receive[] a fair one"). We, therefore, affirm the jury verdicts and the resulting sentences.

FACTUAL AND PROCEDURAL HISTORY

Kittle and his wife Jayne have two children—their daughter Emma and her older brother Sam. (The names are pseudonyms we have substituted to protect the children's privacy.) Kittle and Jayne separated without divorcing, and she moved to Massachusetts with the children. Jayne encountered continuing problems with childcare; so in July 2016, Emma and Sam returned to live with Kittle in McPherson. Jayne visited the children in Kansas a few times. On the last trip, around Memorial Day in 2019, Jayne and her boyfriend stayed with the children at a motel and took them to a water park and other activities in the area.

A day or so before Jayne and her boyfriend were to leave, Emma, who was then about four years old, spontaneously told her mother that Kittle had licked what the child described as her private part. Jayne determined Emma was referring to her vagina. Their conversation took place well into the evening, so Jayne put the children to bed. The next morning Jayne called a sex abuse hotline and then the local police. In the meantime that morning, Emma repeated her statement about Kittle to Jayne's boyfriend. A police officer with the City of McPherson responded to the call; he spoke with Jayne and her boyfriend but not with the children. The officer directed Jayne to take the children to the police station.

A detective trained in interviewing young children suspected to be victims of sexual assault spoke with Emma The jury watched a video recording of that interview during the trial. In the interview, Emma describes Kittle engaging in oral sex with her, as she told her mother, and she also says he touched her vagina with his penis.

2

Emma and Sam were immediately placed in a group home on an emergency basis as children in need of care. Jayne did not get physical custody of them for several months as she awaited approval of an interstate transfer to her. About a week after talking to the detective, Emma underwent a sexual assault examination done by a specially trained nurse at a Wichita hospital. The nurse described Emma as rather hyper and unfocused. During the examination, Emma did not mention any sexual abuse. The nurse noted that Emma did say her mother told her that Kittle did not love her. And the nurse found no physical evidence confirming that Emma had been sexually assaulted. As part of the police investigation, the detective interviewed Kittle; he denied abusing Emma in any way.

Based on the physical contact Emma described to the detective, the State charged Kittle with one count of aggravated indecent liberties with a child, an off-grid violation of K.S.A. 21-5506(b)(3)(A), and one count of aggravated criminal sodomy, an off-grid violation of K.S.A. 21-5504(b)(1).

Emma testified at the jury trial in September 2022. She was then about eight years old. Emma told the jurors that Kittle licked her vagina. In her testimony, she did not recount Kittle touching her vagina with his penis but described him putting his penis in her mouth. Emma's trial testimony also differed from what she told the detective as to the time of day the sexual abuse occurred and how Kittle was dressed. Emma testified that neither Jayne nor her boyfriend told her what to say; she said they told her to tell the truth. Asked if she did so, Emma answered that she had. Jayne testified that she could not recall telling Emma that Kittle did not love her. Kittle testified briefly in his own defense and reiterated that he never abused or harmed Emma. The jury found Kittle guilty of both charges.

About three months later, the district court ordered Kittle to serve a sentence of life in prison with parole eligibility after 25 years on each conviction to be served

3

concurrently. The court further ordered that if released from prison, Kittle would remain on parole for life.

Kittle has appealed.

LEGAL ANALYSIS

As we have indicated, Kittle asserts three distinct trial errors on appeal along with a claim of cumulative error based on the combined effect of those alleged mistakes. We take the points up serially, supplementing our general description of the trial proceedings as necessary.

*Prosecutorial Error*

Kittle contends the prosecutor improperly sought to elicit sympathy for Emma in his closing argument in an attempt to sway the jurors to convict without critically examining the evidence. Although lawyers have considerable leeway in making closing arguments to juries, there are discernable boundaries separating the permissible from the impermissible. So lawyers may not persuade jurors to a verdict with direct or indirect appeals to deeply emotional human instincts, such as the desire to protect a vulnerable child. Those sorts of arguments invite responses and decisions largely detached from the evidence and the law and thus incompatible with the "true" verdict jurors are expected to render without passion or prejudice. See *State v. Thurber*, 308 Kan. 140, 162, 420 P.3d 389 (2018) (argument may not "'inflame the passions or prejudices of the jury,'" thereby diverting from facts and law); *State v. Tosh*, 278 Kan. 83, 92-93, 91 P.3d 1204 (2004) (prosecutor improperly exhorted jurors to convict defendant charged with sexually abusing his daughter by telling them: "You can protect her. You can find him guilty."); *Daniels v. State*, No. 2019 WL 6646417, at *1 (Kan. App. 2019) (unpublished opinion) ("At the start of a criminal case, jurors take an oath that they will render a decision based solely on the law and the evidence—what is commonly called a 'true' verdict."); 6 LaFave

4

et al., Criminal Procedure § 22.3(f) (4th ed. 2023) (jurors' oath "often includes a promise to deliver a true verdict under the law and evidence").

Appellate courts examine an alleged prosecutorial error in closing argument using a standard initially outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). See *State v. Anderson*, 318 Kan. 425, 437, 543 P.3d 1120 (2024) (recognizing and applying *Sherman* test). The *Sherman* standard first considers whether an error has occurred at all and then weighs any prejudice to the defendant resulting from a demonstrable error. Prejudice should be measured against the standard in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the improper argument "'did not affect the outcome of the trial'" taking account of the full trial record. *Sherman*, 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6).

Here, Kittle points to the prosecutor's description of the sexual assault examination at the Wichita hospital and the leadup to it. The prosecutor reminded the jurors that Emma was four years old at the time and had suddenly been placed in a group home a week earlier. In the prosecutor's words to the jury, "her world turned upside down." He pointed out that a social worker took Emma to the hospital, her mother was not there, and she underwent "a fully body exam" including her vaginal area. With that outline, the prosecutor suggested to the jurors those circumstances explained Emma's somewhat unfocused behavior with the nurse and her failure to repeat her statements about Kittle's sexual abuse of her.

In assessing prosecutorial error, the Kansas Supreme Court has cautioned that the challenged comments should be considered in context and not as isolated or detached snippets. *State v. Naputi*, 293 Kan. 55, 59, 260 P.3d 86 (2011) (pre-*Sherman*); see *State v. Phillips*, No. 125,079, 2024 WL 3874064, at *10 (Kan. App. 2024) (unpublished opinion) (relying on *Naputi* in post-*Sherman* case); *State v. Everette*, No. 115,645, 2018 WL

5

4517575, at *10 (Kan. App. 2018) (unpublished opinion) (same). The admonition is well-taken here. Upon full review, that part of the prosecutor's argument presented an explanation for Emma's equivocal conduct during the sexual assault examination—she neither inculpated Kittle nor exculpated him as she interacted with the nurse. We view the gist of the argument as a proper discussion of factors potentially bearing on Emma's credibility. See *State v. Jordan*, 317 Kan. 628, 648, 537 P.3d 443 (2023) (proper argument to discuss legitimate factors bearing on witness credibility); *State v. Franco*, 49 Kan. App. 2d 924, 940, 319 P.3d 551 (2014) (proper jury argument when "the prosecutor focused on how best to evaluate some of that evidence and why that evidence favored [victim's] version of the material circumstances").

The prosecutor's argument amounted to fair comment on why Emma may have acted as she did and why the jurors reasonably ought to discount her behavior during the examination in assessing her overall credibility. Although the circumstances necessarily cast Emma in a sympathetic light, the prosecutor was not making a pitch to convict Kittle because of those circumstances or that light. The comments bore on specific evidence and tied the evidence to the entirely proper decision the juror had to make about who to believe. The argument was unlike the impermissible call the prosecutor made in *Tosh* for the jurors to act as the protectors of a victimized child or the similarly emotional and prejudicial pitch a prosecutor made more recently in *State v. Genzel*, No. 120,602, 2020 WL 3481499, at *7-8 (Kan. App. 2020) (unpublished opinion) (argument implying jurors "will have failed to protect [victim]" if they do not convict defendant was "unquestionably improper"). Because we find no prosecutorial error here, we do not move on to the second step of the *Sherman* standard assessing prejudice.

*Judicial Comment Error*

Kittle contends the district court made a comment shortly after Emma began her trial testimony that would have prompted the jurors to improperly inflate the veracity of

her account and thus to diminish his denial of wrongdoing. What Kittle alleges would be a form of judicial comment error.

The Kansas Supreme Court has identified judicial comment error as a subset of what had been generically termed judicial misconduct and has tailored an analytical tool for evaluating such errors. *State v. Boothby*, 310 Kan. 619, Syl. ¶ 1, 448 P.3d 416 (2019). As described in *Boothby*, those "comment" errors entail inappropriate statements a district court makes in front of a jury apart from the recitation of instructions or the substance of a specific legal ruling. 310 Kan. 619, Syl. ¶ 1. The court described a two-step analytical process to address an ostensible judicial comment error. First, does the challenged statement fall outside what a district court may properly say, i.e., is it error at all? And if so, has the defendant's right to a fair trial been substantially prejudiced as a result? 310 Kan. at 627. The test draws directly from the one for prosecutorial error fashioned in *Sherman*. 310 Kan. at 627 (citing *Sherman*, 305 Kan. at 109). We continue to apply the *Boothby* test. See *State v. Dayvault*, No. 126,224, 2024 WL 2104656, at *3 (Kan. App. 2024) (unpublished opinion) (applying *Boothby* to defendant's claim district court made improper comments in front of jury).

If a judicial comment error adversely affects a criminal defendant, then the State, as the benefited party, must show beyond a reasonable doubt that the error did not deprive the defendant of a fair trial, meaning the outcome, considering the entire record, would have been the same had the error not occurred. 310 Kan. at 627. The standard for evaluating prejudice set out in *Boothby* realigns the burden of proof. Under the traditional judicial misconduct standard, a defendant must prove both the error and actual prejudice. But now under *Boothby,* if a defendant has established a judicial comment error, the State must show the lack of prejudice. 310 Kan. at 626-27.

To put the district court's challenged comment in context, we turn to how the prosecutor presented Emma as a witness during the trial. Recall that she was then about

eight years old. To start, the prosecutor asked Emma her age, where she went to school, if she had pets, and elicited some other basic background information. He then posed about half a dozen questions to her about telling the truth and the importance of doing so. He sought to illustrate for the jurors Emma's understanding of the difference between true and untrue statements by asking her if he was telling the truth about the color of a bottle in the courtroom when he first used the wrong color and then the correct color.

At that point, the prosecutor asked the district court: "Judge, do you have any more questions for her?" The district court responded this way: "I do not. You're doing a great job [Emma]" Kittle contends the district court, in effect, declared Emma to be a truth-teller, thereby committing judicial comment error and irreparably tainting the trial. We don't see it that way.

Up to then, Emma hadn't testified to any facts bearing on the charges against Kittle. The district court first responded to the prosecutor's specific inquiry and next simply told Emma she had been doing well as a witness. We decline to read some broad judicial endorsement of Emma or her credibility into the district court's one-sentence remark.

District courts often tell witnesses to speak up or to wait for the lawyers to finish their questions before beginning their answers. And district courts frequently couch the advice with a comment to the witness to the effect, "You have done a good job up 'til now, but . . . ." Nobody typically considers that sort of stage direction to be amiss. We put the district court's remark to Emma in that general realm on the assumption that she had been speaking audibly and unhurriedly. The record shows she answered with "yes" or "no" rather than by shaking her head or using indistinct expression like "uh huh" and "huh uh"—shortcomings common to adult witnesses that often draw corrective comments from either the lawyer posing the question or the district court. So, to all appearances, the district court seemed to be encouraging Emma to continue answering questions in the

8

manner she had been. We suppose the district court's comment would have been better left unsaid, all things considered. Nonetheless, we find no error.

Even if the remark amounted to judicial comment error, we have no doubt the jurors would have come back with the same verdicts had the district court declined the prosecutor's invitation to question Emma and said nothing more. As we have explained, the comment was brief and delivered before Emma testified to any directly relevant facts. And it was not an obvious endorsement of Emma's credibility. We are confident the jurors made their credibility determination based on what they observed of both Emma and Kittle as they testified and on their out-of-court statements admitted as evidence. See *In re Guardianship & Conservatorship of L.M.H.*, No. 108,297, 2013 WL 2395900, at *13 (Kan. App. 2013) (unpublished opinion) (identifying "the principal mechanisms for measuring the candor and reliability of a witness [as]: (1) the taking of an oath to tell the truth; (2) the rigor of cross-examination to test the statements; and (3) the fact-finder's opportunity to gauge demeanor").

Kittle has not shown the district court made a legally erroneous comment. Moreover, the comment, even if improper, was fleeting and oblique; it would not have influenced the jury verdicts.

*Violation of In Limine Order*

In advance of trial, Kittle's lawyer filed a motion requesting that the detective's questioning of Emma not be referred to as a "forensic" interview. The district court granted the motion and entered an order in limine precluding use of the term "forensic" to describe the interview in front of the jury. We assume in the age of the CSI television franchise and similar police procedurals that often delve into both real and dramatically contrived science, the word "forensic" might impute an unwarranted reliability or precision to some kinds of evidence. Whether that's true of the sort of interview done

9

with Emma is not the question before us, and we do not presume to answer it. Regardless, the district court entered a clear pretrial order, and we do have to consider a violation of the order.

During her testimony, the detective described her questioning of Emma as a forensic interview. Her use of the term plainly violated the district court's order and drew an objection from Kittle's lawyer. The district court sustained the objection and instructed the jurors to disregard the detective's answer. The detective was advised of the order, and there were no more violations.

But the prosecutor also had the detective describe the interview protocol she uses with young children who may be the victims of sexual assault and asked her why she uses that method. The detective replied: "It's proven to be effective." Kittle's lawyer again objected, and the district court sustained the objection.

On appeal, Kittle contends the detective's objectionable testimony gave an undue sheen to the interview of Emma and her account of the disputed sexual misconduct. First, of course, the jurors watched the video of the detective's interview of Emma and could assess for themselves what weight to give that process and Emma's statements. More importantly, the district court sustained the objections and, regarding the use of the word "forensic," explicitly told the jurors to disregard the detective's improper testimony. Absent a strong indication otherwise, we presume jurors follow a district court's instruction not to consider specific testimony or other improperly proffered evidence in reaching a verdict. *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017). In a backward-looking evaluation (such as Kittle asks us to make on appeal), a defendant must point to something in the record suggesting otherwise to make any legal headway. See *State v. Kleypas*, 305 Kan. 224, 279, 382 P.3d 373 (2016); *State v. Marmolejo*, No. 123,076, 2022 WL 68583, at *5 (Kan. App. 2022) (unpublished opinion) (appellate

10

courts presume jurors adhere to instruction to disregard evidence, and defendant bears burden to overcome presumption).

We find the district court's handling of the objections with instructions to the jurors to disregard the challenged testimony was sufficient to mitigate any possible prejudice to Kittle. He has not shown any residual harm materially compromising his right to a fair trial.

*Cumulative Error*

For his final point, Kittle argues that the cumulative effect of the errors in the district court deprived him of a fair trial. Appellate courts will weigh the collective impact of preserved trial errors and may grant relief if that aggregated impact has deprived the defendant of a fair hearing even when the errors considered individually would not necessarily have required reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the effect of multiple errors. 301 Kan. at 167-68. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

We have identified only two errors—the miscues in the detective's testimony. As we have already explained, the district court sustained Kittle's objections and in one instance further instructed the jurors to disregard the improper testimony. That cured each error. Taken together they are no more potent under the circumstances. In reviewing the cumulative impact of evidentiary errors, we should reverse a conviction if we find "a reasonable probability" that the errors collectively affected the outcome of the trial. *State v. Warrior*, 294 Kan. 484, 517, 277 P.3d 1111 (2012). We harbor no such concern here.

11

If we also consider the district court's comment to Emma—although we do not consider it error—the standard of review affords Kittle greater protection because that mistake is a constitutional one. *Boothby*, 310 Kan. at 627. And that standard governs when a constitutional error is considered with nonconstitutional errors. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020). In considering the district court's comment, we extend Kittle an undeservedly deferential consideration of the record and do so simply as a cautious accommodation.

Again, the evidentiary issues and the purported judicial comment error were minor singly or taken together. And they did not have some enhanced adverse effect in which the evidentiary errors made the district court's comment exponentially worse or vice versa. So we comfortably conclude beyond a reasonable doubt the jurors would have come to the same verdicts absent the detective's improper testimony and the district court's challenged comment.

Affirmed.